2011-1370 PFC VSMPO-AVISMA v. United States Did the affidavit have any... or tell us what the practical effect of the admission of the affidavit had on the remaining part of the review. The substantive effect, Your Honor? Well, we believe that the Foster Affidavit provided the Commerce Department with the blueprint for its... the Court of International Trade with the blueprint for its decision. Commerce made clear what it did. It did cost accounting in a particular manner. The Foster Affidavit came in. You know, the Court took the cost... Because it advocated allocation of costs across both titanium and magnesium production. Exactly. Exactly. It provided the complete blueprint and the conceptual framework for the Court of International Trade's decision. And if there's any doubt as to whether it guided the Court's decision, all you have to do is look at the sequence of events that led up to the admission of the Foster Affidavit and then the Court of International Trade's decision. In the first decision, AVISMA won, the Court of International Trade told Commerce to accept the Foster Affidavit onto the administrative record. Commerce accepted it onto the record, issued a lengthy and very well-reasoned opinion stating why the Foster Affidavit was incorrect. It was inconsistent with AVISMA's own books and records. It was inconsistent with the statute. And the Court of International Trade didn't like that. So it said, Commerce, not only do you have to accept the Foster Affidavit, you have to decide the manner consistent with the methodology laid out in the Foster Affidavit. Well, they didn't... It was a little more subtle than that, right? I mean, what the judge said was... I mean, she didn't rely on the Foster Affidavit, she relied on the statute. Now, we can dispute, as you have, whether or not that was the correct application of the statute, but it was really on that basis that she rested her decision, right? That is correct. To be fair, the Court of International Trade did not cite the Foster Affidavit in its decision. Your view is that it ends up being the same thing because it all involves looking at the whole... It forces you to look at the whole production. That's exactly right. I do not assume that the Court of International Trade engaged in an empty or meaningless gesture of ordering Commerce to accept the Foster Affidavit onto the record and then turn around and say, well, you know, I don't really need it, when the decision looks exactly like the methodology proposed by the Foster Affidavit. In the discussion about the admissibility of the... or rather the admission of the Foster Affidavit, there was some discussion about the prominence of Dr. Foster and how Commerce had relied on Dr. Foster in the past. Was there any difference between the methodology that Dr. Foster was setting out in the Affidavit from any other type of opinion or materials that he had written in the past regarding that same methodology? Yes, Your Honor. There were really three differences that we pointed out in our brief. The first one had to do with the allocation or the importance of the split-off point. I think we have a nice diagram in our brief that explains how joint products have incurred joint costs up to the split-off point. The split-off point is very important because the split-off point dictates essentially how or the point at which those two products become separately identifiable. Bear in mind, the whole point of this exercise is to figure out how to assign costs to magnesium and how to assign costs to chlorine. And when they're jointly produced, you have to perform some kind of allocation methodology. The split-off point is where magnesium and chlorine emerge from that joint production process, become separately identifiable and therefore incur separable costs. Commerce can look at those and say, look, I can build the cost model for magnesium based on costs that are actually incurred on magnesium. But before the split-off point gets trickier, it gets trickier because there's a joint production process and the two products are inseparable at that point. So that's the conceptual framework. Now, what did Dr. Foster say about the split-off point? Had commerce in the past relied on that particular methodology determining where the split-off is in order to go on with the cost accounting allocation procedure? It regularly relies on the concept of the split-off point. Dr. Foster's textbooks are put this way. The textbooks that Dr. Foster co-authored with other authors that were subject to peer review also identify the split-off point as being a critical element or principle in cost accounting. Dr. Foster, the advocate in his affidavit, had a very nebulous concept of split-off point. He says in one instance that the split-off point is not really the most important thing in determining how to allocate costs. It's the economics of the facility. I don't know what that means, truthfully, and I'm not really sure that it's clear from Dr. Foster's affidavit. The other thing that he did was say, well, there's not really a split-off point. You have to take into consideration OPU2, which is historically a split-off point. You also have to look at OPU3, which is where titanium is produced. But a split-off point, to use a trite phrase, is kind of like being pregnant. Either you have one or you don't. The products are either joint products and costs cannot be determined before the split-off point. After the split-off point, they can. It's not a hard concept and it's not a nebulous concept. The position articulated in the Foster affidavit that was offered in support of Avizma's position, Avizma basically making that argument prior to the introduction of the declaration of the affidavit, had it not? I mean, wasn't it basically saying you have to look at the... Were they not arguing that before? Was Avizma arguing this concept before the Foster affidavit? I think Avizma put some databases on the record, eight altogether, and some of those databases, and we'll hear about that in a minute, some of those databases had costs allocated on a facility-wide approach. But again, the conceptual framework for this facility-wide approach came up as a consequence of the Foster affidavit. Okay. To address your question, Judge Raynard, the other two elements of the differences between the Foster affidavit and Foster the Academic have to do with the concept of joint costs and joint products. Titanium and magnesium, which are the two products that Dr. Foster's affidavit suggests should be considered for purposes of determining the cost of chlorine and magnesium. Titanium and magnesium are not joint products. They're not joint products. They've never been joint products. They're not jointly produced. There's no point in the Bears-Nikki production process when a cost accountant would look at the production of titanium and magnesium and say, I can't figure out how to assign costs to one versus the other. They're not joint products. Dr. Foster the Academic identifies joint products as one of the key fundamental bedrock principles of cost accounting. There's no way to reconcile the two. And the third point where Dr. Foster the Academic and Dr. Foster the Advocate differ has to do with the concept of end values, whether they have to be saleable products of the respondent or they can be estimates. Again, Dr. Foster the Academic says they can be estimates. Commerce used an estimate. Dr. Foster the Affidavit says they have to be actual end products sold by Avisma. There are just wide diversions between the two. You want to retain your rebuttal time? Yes, please. Okay. We'll hear from the other side now. Mr. Lund. Thank you very much, Your Honors. My name is Mark Lund. I represent plaintiff, cross-appellant, TSC, VSMPO Avisma Corporation, and VSMPO TRC-US collectively. I think one thing I want to address is how we started off today, is why the government is here. They're here to address only the issue of the database that should be used in the calculation of their final determination on remand. The government has not appealed nor commented on either the Foster Affidavit or the methodology used in the final determination on remand. Did the government register an objection to the remand orders from the CIT? Yes, they did. However, one has to presume at this point that they've acquiesced or agreed to the precedent set in that methodology. Concerning the Foster Affidavit, I believe that's a red herring and basically a moot point. The court did not rely upon the Foster Affidavit in its second remand to commerce. Never cited to it.  So you want us to look at the final analysis that's statutorily based. Do you think you rise or fall on that? Yes, because the Foster Affidavit was not the basis upon the remand. The final determination isn't based on that either. Let's turn to the statute then. Am I not correct that the CIT judge kind of misread the statute by omitting that middle provision, which kind of changes the whole view of what we're talking about, what the statute speaks to when it talks about ordinary course of business? I'm talking about Part E. During the period which would ordinarily permit language? Yes. I don't believe that that restricts the ordinary course of business language, and neither did the court. Let me explain to you what I mean in terms, and then skip to some of the other issues that are before the court today. As opposed to what U.S. Magnesium said, in the production facility in Waznitzki, the production of magnesium and titanium are physically attached, and they've been attached for accounting purposes as well. They're physically attached because the magnesium and chlorine production has a pipeline that goes from the magnesium production over to the titanium production, and the chlorine goes from magnesium side over titanium where it's used as a catalyst in that production. Therefore, it's incorrect to say that you can't take into consideration the value of that titanium sponge when valuing the chlorine. They're intricately linked because what is the value of that chlorine to the company? They can't purchase on the open market. They have to produce it this way, or they stop producing titanium sponge. So the value of that chlorine is based on the value of the titanium sponge. That's the ordinary course of business that the company has to look at when it sets its cost accounting methodology. That's what the court was looking at. Maybe this is what you're speaking to, but I'm not really absorbing it. If you read the statute, it seems to me, and tell me if you disagree with this reading, that in the ordinary course of business only relates to and modifies the relevant time period in which the cost of production are to be calculated. No, I don't believe that. So you think that it's read as what does the ordinary course of business modify then? I don't believe it's during the period which would ordinarily permit the production of the marginals. In the ordinary course of business. Right. I don't believe it's restrictive on the time period. Then what does it modify? Does it modify producing the merchandise? It relates to merchandise. In other words, you would read it as producing the merchandise in the ordinary course of business. Yes. Doesn't that ignore the intervening phrase that I just called out? No, I don't believe it ignores it necessarily, but I believe it also doesn't restrict it to that particular situation. If we disagree with that reading, then we have to reverse, right? No, I don't believe you do. Okay, why not? Because I think you still have to look at the statute says, okay, look at it. Using that reading, let's look at it during you have to consider how long it takes to produce the stuff in the ordinary course of business. So they did have to look at a certain period of time. They suggested if the plant was shut down, that would be appropriate. But I don't believe that you're still looking at it over a specific period of time during the period of review in the ordinary course of business. So I don't believe that it is that restrictive. So even if you say that ordinary course of business is modifying ordinarily during a period, that you're still doing that same thing during the period of review that we have to look at. The Department of Commerce looks at generally a 12-month period. What is the cost of material in the ordinary course of business? So I don't believe you do have to do it because if you don't look at the entire facility, you're basically eliminating that ordinary course of business as provision. And you're ignoring the facts on the record of how this company produces its goods. Isn't that the essence of what Dr. Foster was saying in his affidavit? Yes. Right. As Judge Schall was saying, that is one of the things we argued in the underlying administrative proceeding. So he was simply affirming evidence that was already on the record. The court did not feel that it needed to rely on his affidavit to issue its determination. If I may move on just for a minute to my affirmative issue. Counsel for USMAG said we had submitted eight databases. I didn't quite realize it was that many. But I need to explain very quickly the way the cost accounting is done at Avismo is a series of interlocking spreadsheets, cell spreadsheets, that then lead up to individual products. These underlying spreadsheets have never been questioned. That's the data that we're using. But as you adjust the methodology, the allocation provisions, you have to make certain adjustments to come up with the final database. We submitted numerous databases. Many were not commented on in the underlying case. There were some mistakes in some. These are intricate things and there were just some Excel errors that occurred in creating some of these databases. When they became relevant wasn't until the remand determination. Once they became relevant, we looked at the data that was used in the draft remand determination. We said the Department of Commerce, there's a mistake in what you're using. If you look at the underlying data, pointed them to the spreadsheet they needed to look at, the cell they needed to look at, you will see what the correct number is. Nowhere did they do that. They relied on our statements before, which were not totally clear in our discussion of the database. So what database did they use for the Commerce use for the first remand? The first remand, there was no change in the first remand. That was where they looked at that foster. They did make a comment. They said in looking at foster, we also saw this particular mistake. But even at that point, it wasn't particularly relevant. It wasn't until the second remand where they did look at the entire facility and had to make a determination on which database to use. That they used the incorrect database. So hypothetically, this comes into play only, certainly only if there's not a reversal of the CIT. No, of course not. This is an issue of, assuming they, it depends on what the final methodology is used. When Commerce made its first determination, and this is going back to Judge Coral's question, which database did they rely on? I believe, and I'm trying to avoid this, I believe it was COP. We labeled it as COP-2 and we wanted them to use COP-1. But that's in our briefs. Well, maybe the government can. Yeah, they can. But I was trying to avoid discussions of, because it becomes very complicated at that point. The underlying issue is, we believe we pointed them to the correct data and it wasn't used. So I might time it out. And then you'll get a response, a brief response across the government's opposition. Thank you very much. Okay, please go to the court. Commerce reasonably decided to rely on data that abused what previously said corrected errors in pre-split-off costs rather than data that abused, not only had previously said were wrong, but explained why they were wrong. So can you answer, Mike, I guess both Judge Rayna and I wanted to assure ourselves what database Commerce used for purposes of the first remand? I believe it was the COP-2 database. The COP-1 database and the issue we're talking about is the difference between COP-1.1 and 1.2. That database relied on taking all of the titanium, magnesium, chlorine production processes as a whole. And because in the original determination and in the first remand, Commerce did not take that approach. The COP-1 database and the errors in the COP-1, COP-1.1 and COP-1.2 versions were basically irrelevant. And so it is correct that the discussion of how exactly to correct these errors did not come up until the second remand. However, when Avisma first submitted the COP-1 database saying we would like you to use this database, 10 days later, they resubmitted two more versions and said that it corrected mistakes in the first version, the COP-1. And there were two versions. The COP-1.1 corrected one of those errors and they said COP-1.2 corrected both errors. That second error that was only in COP-1.2 was an error calculated by putting a magnesium chloride offset improperly in the pre-split-off cost rather than in the post-split-off production process. Now, when you look at the underlying worksheet that they submitted, that is supposed to reflect that in COP-1.2, there are two columns that should add up to the same number and they don't. One column has been, the numbers have changed from the COP-1 and COP-1.1 databases and the other column was not changed. And because those numbers are supposed to be the same, everyone recognizes that there's an error in that underlying NRV worksheet. What Commerce determined to do was that you told us that the number before was underestimating the pre-split-off cost. You changed certain numbers. It's clear that you didn't change all of the numbers and we will fix that error and then we'll have the correct numbers to work from. What Avizma asked, and asked in the second determination, was saying, well, there's an error in COP-1.2 underlying numbers, let's just go back to the COP-1.1 numbers, which they had previously said were wrong. It didn't correct this magnesium chloride offset issue and that there's never been any indication that the COP-1.1 database was in fact correct with respect to this magnesium chloride offset. Even in a brief to this court, Avizma has said that the COP-1.1 database only corrected the first error and not the error of the pre-split-off cost. Well, what was the offset issue? Was it quite a transportation cost? I'm... I'm not quite clear on what the offset represented, but it was... it's in the post-split-off phase that the offset would apply and they improperly applied it earlier in the production process before it split off. And the COP-1.1 database on the numbers that Avizma is now asking and saying should have been used did not reflect that correction, the correction of that magnesium chloride offset being in the wrong place. So there's no allegation that the database in the first remand had errors? The... yeah. The first remand... I'm not sure I understand your question, Your Honor. In the first remand, this database wasn't actually relied upon. Commerce didn't rely upon it. The comment about Dr. Foster's data having errors in it is because the NRV worksheet for the 1.2 database that does have an error in it because those two numbers aren't equal, that was reflected in Dr. Foster's affidavit. And Commerce said, well, there's clearly an error here, but since we're not relying on it, we're not going to go further into it. And the parties also didn't really discuss it because the issue was whether they were going to take into account the titanium offset at all. I think we have your argument. Thank you, Your Honor. Now, Mr. Riley will let you finish your rebuttal and then we'll recognize Mr. Wong for a couple minutes to respond on the cross appeal. Thank you, Your Honor. I'm sorry, not Mr. Riley, Mr. Teller. I apologize. I knew who you were talking about. I would like to go back to your point, Your Honor, about the ordinary course of business language relied on by the judge. Commerce has an enormous amount of discretion in this area. It can only be reversed if it is not based on substantial evidence or otherwise in accordance with law. The Court of International Trade pointed to that language, ordinary course of business, as the basis for reversing commerce, and the court was wrong for three reasons. First, it was the wrong statute. The statute that houses the phrase ordinary course of business is the general cost of production statute. The next statute down, which is the one that the Commerce Department expressly relied on in its decisions, which is 1677BF, is a special rule. It's called a special rule for the calculation of costs. It says, in summary, look to abysmas or the respondents' books and records and its own cost accounting methodologies to determine how to cost or do the cost allocations. What did abysma do in this case? Abysma kept its costs at OPU2, the very cost center that the Commerce Department looked at to calculate the cost of raw magnesium and chlorine. Abysma doesn't keep its costs at the Beresnicki-wide facility. It doesn't try and calculate or allocate costs to chlorine or magnesium based on the production of titanium sponge. It's never done so. Today, it does not do so. Why should commerce have to use a cost allocation methodology that abysma doesn't even use when the statute, when Congress told commerce to use abysmas or books and records if they can reasonably do so? There's no reason for doing that. The CIT picked the wrong statute. The CIT never mentioned the statute that commerce actually relied on. The second reason why the Commerce Department was right and the CIT was wrong on the ordinary course of business language is the one that you picked up on, Your Honor. That statutory provision, ordinary course of business, cannot be read in a vacuum. It's part of a longer piece of language in the statutory language. It's part of the prepositional phrase, in fact, that says, during a period in which. What does that mean? Well, commerce actually has already said and told, described what that means. It means in a non-advert fashion. In other words, if a plan is starting up, if a plan is shutting down, that's not the ordinary course of business. Costs can be distorted in those circumstances. We don't look to the costs. We don't, that's not, we can't use costs in that situation because they're not kept in the ordinary course of business. They're exactly right in their interpretation of the statute. So the cost data that was relied on by commerce in the investigation, it was data supplied by Abisma? It was data supplied by Abisma and it was done pursuant, not only to the raw data that Abisma supplied, the numbers, it was done according to Abisma's own cost accounting methodologies. Abisma keeps costs at the OPU2 processing point. That's where magnesium and chlorine are processed together. It doesn't have anything to do with titanium. Titanium's over there at OPU3. At OPU2, which is where magnesium and chlorine are processed, if you go to Abisma's own books and records, not only are the data there, but they keep their costs and allocate costs at that point. Abisma does not, nor has it ever, looked to titanium sponge to allocate the costs of magnesium and chlorine. They just don't do it. Do you have your argument? Or do you have a final thought? One final thought, and this is really Abisma's principle argument. It has to do with the concept of end values. What Dr. Foster says and what Abisma says is, you have to go to a scalable end product in order to allocate costs. In other words, you can't do what commerce did here, which is to estimate the value of chlorine based on market prices. There is no statute, there is no precedent, there is no case that requires commerce to do that. The only applicable statute that requires commerce to calculate costs is, say, look at Abisma's books and records, that's how Abisma does it, that's how the Commerce Department should do it. Commerce shouldn't have to do it in a manner that's inconsistent with Abisma, particularly when the basis for Abisma's argument finds no support anywhere in the statute. It's just not there. Thank you. Do you have your argument? And now we'll hear finally from Mr. Long for a couple of minutes on the cross-appeal question. Thank you very much, Your Honor. It was COP 1.2 that commerce used in its final remand determination, and we believe that COP 1.1 was the correct one. But that's, I think, missing the point. Our point was more, you know, look at the underlying data and figure out for yourself what the correct answer is. Commerce has relied almost entirely on the fact that we said, okay, there are some mistakes here. That was said several years before the final remand determination a year and some time, and nobody ever commented on it. It wasn't a factor. They said there were a lot of databases. It's a very complicated issue when you try to do this. When the error became, when the databases became relevant, we raised them, and we said, here's how you determine what the correct answer is. The government is correct. It has to do with magnesium chloride split-off point. So, as we said, and one thing I would like to correct that Mr. Stelop said, the OPU-3, the OPU-2 magnesium production facilities are not in isolation. They are tied from an accounting perspective to titanium sponge, and they've been that way since in 10 years that we've been working on this case. When you calculate the cost, I said there's a series of spreadsheets. They come up with the cost for chlorine. It then gets transferred over to the titanium sponge. So, it's absolutely incorrect to say that they only keep their costs on OPU-2. They've never done that, and the only issue is how do they determine, how do you figure out what the cost is, the expenses that you transfer to the titanium sponge. Those costs have always been divided between magnesium and titanium sponge. Done that for 10 years. There have been changes in the company that necessitated a change in methodology. If the dollars have been divided, then why should they be included? Why should you have a company-wide database if the books actually show an allocation of chlorine to the titanium production? That's because you use the chlorine in the titanium sponge production. So, there's a value to it. For a cost accounting perspective, you need to determine what that value is. That's what the company has done. It's always done that. It did that in the initial investigation. The only thing that has been changing is that it was a mine disaster, they cut back on the amount of magnesium they produced, and the company merged. It wasn't always VSMP or VSMA. It was just a VSMA. When all these changes account, the company decided that the cost accounting methodology they were using wasn't sufficient. So, they had to go and look at another approach. But they've always tied the two. Once you allocate chlorine cost to a titanium sponge, you are allocating them. You are tying the two. I think your time is up. We appreciate your involvement. Thank you very much. That concludes the proceedings for today.